

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
PATRICIA LUCA,

                  Plaintiff,

       -against-

THE COUNTY OF NASSAU

                Defendant.

---------------------------------------------------------x

**MEMORANDUM & ORDER**
Case No.  04-CV-4898 (FB)

*Appearances:*
*For the Plaintiff:*
FREDERICK K. BREWINGTON, ESQ.
50 Clinton Street, Suite 501
Hempstead, NY 11550

*For the Defendant:*
LORNA B. GOODMAN, ESQ.
Nassau County Attorney
By: RALPH REISSMAN, ESQ.
Deputy County Attorney
One West Street
Mineola, NY 11501

**BLOCK, Senior District Judge:**

        The jury in this action found defendant, the County of Nassau ("the County"), liable to plaintiff, Patricia Luca ("Luca"), under Title VII on the ground that the decision of the Nassau County Police Department (the "Police Department") not to hire her was motivated by retaliatory animus. It awarded Luca $150,000 as compensatory damages for emotional distress and pain and suffering.

        During trial, the parties agreed that in the event of a verdict in Luca's favor, the Court would determine her entitlement to, and the amount of, the equitable remedies of back pay and front pay.[1]  In addition, Luca's counsel, Frederick Brewington

---

[1] "[B]ack pay and front pay have historically been recognized as equitable relief under Title VII," *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 157 (2d Cir. 2001);

("Brewington"), has applied for an award of attorney fees and costs.

Both parties have filed memoranda of law on all issues. In addition, the Court held an evidentiary hearing on the issues of back pay and front pay on January 30, 2008, followed by a supplemental hearing on February 26, 2008. For the following reasons, the Court does not award Luca back pay, but awards her front pay of $604,589, comprising future lost wages of $447,151 and future lost pension benefits of $157,438. The Court grants Brewington's application in the amount of $195,384.96, comprising attorney's fees of $179,722.50 and costs of $15,662.36.

## I. Back Pay

"An applicant denied employment in violation of the civil rights laws is 'ordinarily [ ] entitled to an award of back pay from the date of [the discriminatory action] until the date of judgment.'" *Sands v. Runyon*, 28 F.3d 1323, 1327 (2d Cir. 1994) (quoting *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 144 (2d Cir. 1993)). The parties agree that the relevant time period in this case is January 1, 2004, the date that Luca would have joined the Police Department but for the County's retaliatory actions, to October 17, 2007, the date that the jury returned its verdict.

Title VII makes clear that back pay awards should be offset by amounts actually earned during the back pay period. *See* 42 U.S.C. § 2000e-5(g)(1) ("Interim

---

as such, they are not subject to cap on compensatory and punitive damages imposed by 42 U.S.C. § 1981a(b)(3). *See id.* § 1981a(b)(2) ("Compensatory damages . . . shall not include backpay, interest on backpay, or any other type of relief authorized under [Title VII]"); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 854 (2001) ("Because front pay is a remedy authorized under [Title VII], Congress did not limit the availability of such awards in § 1981a.").

earnings . . . by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."). In her pre-hearing submissions, Luca argued that she was entitled to $4,188 in back pay because, for certain years during the relevant time period, she would have made more as a police officer than she did as a corrections officer. At the January 30th hearing, however, her counsel conceded that the $4,188 was offset by the pay differential for years in which Luca made more as a corrections officer than she would have made as a police officer. *See* Jan. 30th Hearing Tr. at 8.[2] As a result, she is not entitled to back pay.

## II. Front Pay

### A. Entitlement

"[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard*, 532 U.S. at 846 (2001). An award of front pay under Title VII "lies within the discretion of the district court." *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 n.7 (2d Cir. 1996) (citing *Saulpaugh*, 4 F.3d at 145). In exercising that discretion, the Court is guided by the Second Circuit's admonition to district courts "to fashion remedies designed to ensure that victims of . . . discrimination are made whole." *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984).

The County offers two reasons why the Court should exercise its discretion to deny or limit an award of front pay. First, it argues that Luca can be made whole by

---

[2]In the aggregate, Luca made $34,637 more as a corrections officer than she would have earned as a police officer during the relevant period.

reinstating her to the civil service list for police officer positions. Second, it argues that any award of front pay should be limited to three years because Luca should be able to find other employment in which she would earn as much as a police officer within that time frame.

## 1. Reinstatement

With respect to reinstatement, the Second Circuit has explained that a plaintiff can often be made whole "through an award of back coupled with an order of reinstatement." *Whittlesey*, 742 F.2d at 728. It has recognized, however, that "[r]einstatement may not always be possible" because "the employer-employee relationship may have been irreparably damaged by animosity associated with the litigation," *id.*; in such cases, "a reasonable monetary award of front pay is necessary." *Id.*; *see also Pollard*, 532 U.S. at 846 ("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement.").

The Court rejects the County's proposed remedy of reinstatement to the civil service list for two reasons. First, the County's proposal does not constitute an unconditional offer of employment. As the County's counsel made clear at the January 30th Hearing, Luca would still need to "undergo an updated background investigation, physical exam, [and] psych exam by the Civil Service Commission," Jan. 30th Hearing Tr. at 217; even then, she would not be guaranteed a job as a police officer because "[b]y Civil Service law the only thing [the County] can do is give her the chance to be where she was,

put her right back . . . on the eligible list." *Id.* In the absence of any guarantee that Luca would ever be offered employment as a police officer, it is dubious whether mere placement on the eligible list would constitute "reinstatement."

In any event, the record is replete with evidence of hostility between Luca and Police Department employees: During her background investigation, Luca was maligned by, among others, Officer Cresswell and Captain McGovern. *See, e.g.,* Trial Ex. PP. This attitude clearly persists. As Officer Cresswell testified at trial, although she had never been able to document it, she believed that Luca had "criminal activity that was swirling around her." Trial Tr. at 855-56. At the January 30th Hearing, Luca testified that these allegations of criminal activity made her "very upset," and that she "would not feel comfortable at all" working with them. She further testified that she had witnessed rank-and-file members of the Police Department commenting about her in a derogatory way, saying, for example, "Careful what you say because she'll call Newsday," Jan. 30th Hearing Tr. at 219; in light of such comments, she would not feel comfortable relying on other officers "when [her] life is depending on it," and she "would not have any trust in the Police Department." *Id.* In sum, the Court is satisfied that the Police Department and its employees continue to bear such hostility toward Luca that reinstatement would not be a viable remedy.

## 2. *Mitigation*

With respect to the County's argument that Luca could secure substitute employment, it is settled law that a victim of employment discrimination is required to mitigate her lost wages by "us[ing] reasonable diligence in finding other suitable

employment." *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 125 (2d Cir. 1996) (citations, internal quotation marks and emphasis omitted). "Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate" by showing "(1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it," *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (citations and internal quotation marks omitted); "[i]n exceptional cases, an employer may be "released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." *Id.* (citation and internal quotation marks omitted).

The County has not offered any evidence that comparable police officer positions existed, or that Luca did not attempt to obtain those positions. Luca, by contrast, has offered ample evidence that after being "nonselected" by the Police Department in December 2003, she diligently sought positions with numerous local police departments on Long Island; she stopped applying when she became age-ineligible for police officer positions on her 35th birthday. *See* Jan. 30th Hearing Tr. at 205-06. Moreover, it is undisputed that Luca remains employed as a corrections officer. Taken collectively, these facts are more than sufficient to establish that Luca reasonably attempted to mitigate her lost wages. *Cf. Padilla*, 92 F.3d at 125 ("[G]iven the lack of evidence of other opportunities available to Padilla, his decision to assume the position of train dispatcher at Metro-North after his demotion was reasonable mitigation.").

**B. Amount**

Luca's claim for front pay is composed of two elements: future lost wages and future lost pension benefits. Each party retained an expert to estimate these losses. Both experts submitted reports and testified at the post-trial evidentiary hearings. The Court has carefully considered the experts' reports and testimony in making its calculations.[3]

*1. Future Lost Wages*

To calculate Luca's future lost wages, the Court must determine the difference between what Luca would have earned as a police officer though the date of her retirement and what she will earn as a corrections officer during the same time period. Although the front pay period should technically begin immediately after the back pay period ends, Luca's counsel has agreed, for the sake of simplicity, to use January 1, 2008, as the starting date. *See* Jan. 30th Hearing Tr. at 134. For the end date, the Court uses Luca's 62nd birthday – July 6, 2031 – based on Luca's testimony, which the Court finds credible, that she "would definitely work until [she was] at least sixty-two." *Id.* at 195.

**a. Earnings as a Police Officer**

Both experts used the current contract between the County and the Nassau County Patrolmen's Benevolent Association (the "Police Contract"), *see* Pl.'s Ex. 250, to

---

[3]The County argues that front pay beyond three years would be excessively speculative; however, the experts' reports and testimony provide a firm – if imperfect – basis for the Court's award. *See Tyler v. Bethlehem Steel Corp.* 958 F.2d 1176, 1189 (2d Cir. 1992) ("Although front pay awards always involve some degree of speculation, we think that the jury's deliberations were well-cabined by the expert testimony of expected income, possible future earnings from other employment, and expected worklife.").

estimate Luca's earnings as a police officer. The Police Contract sets forth the base salaries for members of the 2004 recruit class – of which Luca would have been a member – for the term of the contract, 2007 to 2012; both experts prorated those base salaries to account for the fact that increases take effect three months into the calendar year, on April 1st.

The rate of the yearly pay increases set forth in the Police Contract varies greatly; however, for the 2004 recruit class, it stabilizes at 4% – essentially a cost-of-living increase – in 2012. Both experts assumed that this 4% yearly increase would persist through Luca's retirement in 2031.[4]

Under these undisputed assumptions, the base earnings of a police officer in Luca's recruit class would total $3,629,654 between January 1, 2008 and July 6, 2031.[5] Both parties' experts modified this base calculation: Dr. Leiken *increased* the total by 15% on the assumption that Luca would earn substantial overtime as a police officer. Dr. Zaumeyer *reduced* the total by deducting 7.65% for Social Security and Medicare contributions and 2% for "work related expenses."

The Court rejects both parties' proposed adjustments to the base calculation. With respect to overtime, the Court concludes that determining the difference between the

_____

[4]Strictly speaking, the County's expert, Dr. David Zaumeyer ("Zaumeyer"), assumed an annual increase of 3.9%, based on his mistaken belief that it was the rate set forth in the Police Contract; however, he conceded at the January 30th hearing that the difference was negligible.

[5]The Court uses the calculation of total earnings prepared by Luca's expert, Dr. Alan Leiken ("Leiken"). Since that calculation slightly understates the earnings for 2008, while Zaumeyer's calculation substantially overstates the rate of increase between 2012 and 2013 (and, hence, overstates earnings between 2013 and 2031), the Court's choice inures to the County's benefit.

amounts of overtime as a police officer and as a corrections officer is too speculative. With respect to the deduction for Social Security and Medicare contributions, the Court notes that Luca would pay these salary taxes whether she worked as a corrections officer or a police officer; any differential in the total amount of contributions is a matter between Luca and the federal government. Finally, with respect to "work related expenses," Zaumeyer's calculation of the total difference between expenses as a police officer and expenses as a corrections officer is simply too small to warrant judicial examination.

## b. Earnings as a Corrections Officer.

The parties agree that Luca's annual base salary as a corrections officer was $72,645 in 2007. Unlike police officers, corrections officers do not currently have a contract with the County; however, the prior contract (which expired in 2004) provided for annual increases. Both experts used the pay scales in the prior contract to calculate the expected future wage growth of corrections officers: Lieken calculated an annual rate of 4%, while Zaumeyer calculated an annual rate of 3.8%. Since, as Zaumeyer conceded at the January 30th hearing, the difference is "modest," Jan. 30th Hearing Tr. at 143, the Court uses 4%. At an annual growth rate of 4%, Luca's earnings as a corrections officer will total $2,863,349.

The parties' central dispute relative to corrections officer earnings involves "longevity pay." Under the prior contract, corrections officers began receiving annual lump sum payments following their eleventh year of service. These payments totaled $4,100 through the fifteenth year; thereafter, the prior contract provided for a payment of

9

"125 a year." Def.'s Ex. DDDD at 20.[6]

Leiken did not include longevity pay in his calculations on the ground that the contracted provided that the lump-sum payments "shall not be included in basic salary for any contract purpose." *Id.* Zaumeyer, by contrast, included the longevity payments in his calculation of base salary; in addition, he assumed that longevity pay for the sixteenth year and thereafter is *cumulative* with the prior year's pay. *See* Feb. 26th Hearing Tr. at 18 ("It is my understanding they get $1,350 plus 125 . . . ").

Longevity pay for corrections officers was extensively discussed at the February 26th hearing. For the reasons stated at that hearing, the Court concludes that annual longevity payment must be included in the calculation of Luca's future earnings as a corrections officer, but are not part of the base salary subject to the 4% annual increases. With respect to the amount of the payments, the Court rejects Zaumeyer's interpretation of the prior contract as providing for cumulative longevity pay; the contract plainly provides that corrections officers are to receive "125 a year" after their sixteenth year of service.

Longevity payments through Luca's retirement date total $6,485. These payments must be added to her base earnings as a corrections officer, for a total of $2,869,834.

## 2. *Future Lost Pension Benefits*

Calculation of Luca's lost pension benefits is analogous to calculation of her

---

[6]By contrast, the Police Contract factored length of service into police officers' base salary.

future lost wages: The Court must determine the difference between the amount Luca would have received in benefits as a police officer and the amount she will receive as a corrections officer. The relevant time period runs from the date Luca retires – July 6, 2031 – through the remainder of her life; as both parties' experts assumed a life expectancy of 82 years, the Court uses Luca's 82nd birthday – July 6, 2051 – as the end date.

Upon retirement, both police officers and corrections officers receive an annual pension equal to a percentage of their "final average salary" (or "FAS"). *See* Def.'s Exs. YYY (pension plan for police officers), ZZZ (pension plan for corrections officers). The percentage is based on years of service; FAS is defined as the recipient's average salary for the three years preceding retirement.

The parties agree that under the retirement plan for corrections officers employees who retire with less than 20 years of service receive 1.66% of their FAS for each year of service; employees who retire with 20 years of service or more receive 2% of their FAS for the first 20 years of service plus 1.5% of their FAS for each additional year of service. *See* Def.'s Ex. ZZZ at 26.

The parties dispute the formula for calculating police officer pensions. Based on his reading of the plan documents, Zaumeyer assumed that police officer pensions are capped at 50% of FAS. *See* Jan. 30th Hearing Tr. at 147; Def.'s Ex. YYY at 16. At the January 30th hearing, however, Captain Thomas Krumpter ("Krumpter") – who serves as the commanding officer of the Personnel and Accounting Bureau at the Police Department – testified that the formula is 50% of FAS for 20 years of service plus 1.66% for each

additional year of service, up to a maximum of 70%. *See* Jan. 30th Hearing Tr. at 102. The Court credits Krumpter's testimony.

### a. Pension Benefits as a Police Officer

Had Luca been hired as a police officer on January 1, 2004, she would have accrued 27.5 years of service upon her expected retirement on July 6, 2031; under Krumpter's formula, that equates to 62.45% of FAS. Using that percentage, Leiken calculated Luca hypothetical pension as a police officer to be $142,091; the Court's own calculation yields an annual pension of $141,910.[7]

Krumpter testified that Luca's prior service as a corrections officer would not have affected her pension as a police officer. As Leiken explained at the February 26th hearing, however, Luca would have received a separate pension for the approximately eight years she worked as a corrections officer prior to January 1, 2004; Leiken calculated the amount of that pension to be $6,991 per year. *See* Feb. 26th Hearing Tr. at 26-27. Adding that to her police officer pension yields an annual pension of $148,901; over 20 years, the total income from her pensions would be $2,978,020.

### b. Pension Benefits as a Corrections Officer

Since Luca began working as a corrections officer on January 19, 1996, she will have accrued 35.48 years of service upon her expected retirement; the parties agree that this translates to a pension equal to 68.22% to FAS. Using that percentage, Leiken

---

[7]The difference arises because the FAS calculated by the Court was slightly less than that calculated by Leiken.

calculated Luca's retirement benefit as a corrections officer to be $120,901.[8] Over twenty years, these payments will total $2,418,020.

### 3. Reduction to Present Value

Luca's net future lost wages (i.e., earnings as a police officer minus earnings as a corrections officer) total $759,820, and her net future lost pension benefits (i.e., pension benefits as a police officer minus pension benefits as a corrections officer) total $560,000. Because, however, "a dollar received in the future will almost surely have less purchasing power than a dollar has today, . . . estimates of lost future earnings [must] reflect the effect of inflation." *Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 745 (2d Cir. 1988). Thus, the Court must discount Luca's future lost wages and pension benefits to present value.

The parties' experts used different discount rates in making their calculations: Leiken used the current 10-year T-bill rate of 3.8%, while Zaumeyer used the current 20-year T-bill rate of 4.5%. As discussed at the January 30th hearing, the Court concludes that a rate of 4% represents a reasonable compromise.

At that discount rate, the present value of Luca's future lost earnings is $447,151, and the present value of her future lost pension benefits is $157,438.[9] The Court awards the total – $604,589 – as front pay.

---

[8]This is more than the Court's own calculation of $119,934; consequently, using Leiken's number inures to the County's benefit.

[9]Year-by-year calculations of Luca's future lost wages are set forth in Appendix A to this Memorandum and Order; year-by-year calculations of her future lost pension benefits are set forth in Appendix B.

### III. Attorney's Fees and Costs

Title VII provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k). "[A]wards of attorney's fees in civil rights suits under fee-shifting statutes . . . normally include those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged [to] fee-paying clients." *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987) (citations and internal quotation marks omitted). When the prevailing party in a civil-rights action is the *plaintiff*, attorney's fees and costs should normally be awarded "unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citation and internal quotation marks omitted).

A plaintiff prevails on a Title VII claim "when she succeeds on any significant issue in litigation which achieves some of the benefit the party sought in bringing suit." *Bridges v. Eastman Kodak Co.*, 102 F.3d 56, 58 (2d Cir. 1996) (citations, internal quotation marks and alterations omitted). Having recovered $754,589 in damages and front pay, there can be no doubt that Luca is the prevailing party on her Title VII claim; accordingly, Brewington seeks an award of $185,877.50 in attorney's fees and $15,662.36 in costs. The County opposes the application for fees, but not the application for costs.

The starting point in determining a reasonable attorney's fee is calculation of the "lodestar." *See, e.g., Seitzman v. Sun Life Assurance Co.*, 311 F.3d 477, 487 (2d Cir. 2002). While a panel of the Second Circuit has recently recommended abandoning the term

"lodestar" in favor of "presumptively reasonable fee," *see Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008), the methodology remains the same: "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433.

In support of his fee application, Brewington has submitted contemporaneous time entries for him and his staff, as well as an affidavit attesting to their regularly charged hourly rates;[10] his proposed lodestar or presumptively reasonable fee breaks down as follows:

| Staff Member | Hourly Rate | No. of Hours | Proposed Lodestar |
|---|---|---|---|
| Frederick K. Brewington | $400 | 269.30 | $107,720.00 |
| Ira Fogelgaren | $300 | 23.50 | $7,050.00 |
| Gregory Calliste, Jr. | $250 | 3.70 | $925.00 |
| Wendy Pelle-Beer | $250 | 110.50 | $27,650.00 |
| Leslie J. Lanoix | $250 | 83.40 | $20,850.00 |
| Valerie M. Cartright | $250 | 41.20 | $10,300.00 |
| Mili Makhijani | $150 | 49.75 | $7,462.50 |
| Precilla Lockett | $100 | 34.45 | $3,445.00 |
| Victoria Roberts (paralegal) | $75 | 0.50 | $37.50 |
| Conor Cash (paralegal) | $75 | 1.50 | $112.50 |
| Robert Preston (law student) | $25 | 1.00 | $25.00 |
| **TOTAL** | | **618.90** | **$185,577.50** |

---

[10]As the County points out, Brewington provides current hourly rates, and does not state what rates the members of his firm charged in 2004, 2005, 2006 or 2007. The Second Circuit has held, however, that "current rates, rather than historical rates, should be applied in order to compensate for the delay in payment." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).

### 1. *Number of Hours*

Without raising any challenges to specific billing entries, the County contends that the number of hours submitted by Brewington should be reduced by 25% because the billing entries are (1) based in part on unsuccessful work, (2) vague and (3) excessive. The Court finds all three reasons unpersuasive.

With respect to the County's first contention, the Supreme Court has noted that where a plaintiff's "claims for relief . . . involve a common core of facts or [are] based on related legal theories," the plaintiff's suit "cannot be viewed as a series of discrete claims." *Hensley*, 461 U.S. at 435. In such a case, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation" when determining attorney fees. *Id.* All of Luca's claims were factually and legally related; therefore, the fact that the Court granted the County summary judgment on some of the claims is of no consequence.

With respect to the argument that the billing records are vague, they are more than adequate to allow the Court to meaningfully review them. This is all that is required. *See id.* at 437 n.12 ("Plaintiff's counsel . . . is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures.").

Finally, with respect to the argument that the hours expended were excessive, the Court notes that this litigation spanned more than three years and has been vigorously defended at every stage; it resulted in a motion for summary judgment, a motion for reconsideration, a six-day trial and a two-day evidentiary hearing on front pay. From the

16

Court's vantage point, it was eminently reasonable for Brewington and his staff to spend

618.9 hours prosecuting Luca's claims. *See DiFilippo v. Morizio*, 759 F.2d 231, 236 (2d Cir.

1985) ("The reasonableness of the time claimed is to be judged by standards of the private

bar as informed by the district court's familiarity with the particular case and its experience

in such matters.").

## 2. *Hourly Rates*

As the Second Circuit has recently reiterated, a reasonable hourly rate is "the

rate a paying client would be willing to pay." *Arbor Hills*, 522 F.3d at 190. In determining

this rate, a district court must "bear in mind *all* of the case-specific variables that [the

Second Circuit] and other courts have identified as relevant to the reasonableness of

attorney's fees," *id.*; this includes the twelve so-called *Johnson* factors:

> (1) the time and labor required; (2) the novelty and difficulty of
> the questions; (3) the level of skill required to perform the legal
> service properly; (4) the preclusion of employment by the
> attorney due to acceptance of the case; (5) the attorney's
> customary hourly rate; (6) whether the fee is fixed or
> contingent; (7) the time limitations imposed by the client or the
> circumstances; (8) the amount involved in the case and the
> results obtained; (9) the experience, reputation, and ability of
> the attorneys; (10) the "undesirability" of the case; (11) the
> nature and length of the professional relationship with the
> client; and (12) awards in similar cases.

*Id.* at 186 n.3 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.

1974)). In addition, a district court must "bear in mind that a reasonable paying client

wishes to spend the minimum necessary to litigate the case effectively." *Id.* at 190.

"Normally a district court . . . awarding attorney fees . . . will consider the

prevailing rates in the district in which the court sits." *Polk v. New York State Dep't of Corr.*

*Servs.*, 722 F.2d 23, 25 (2d Cir. 1983). As the Second Circuit explained in *Arbor Hill*, this so-called "forum rule" is based on a presumption that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally." 522 F.3d at 191. Although the circuit court opined that the presumption would be rebutted "only in the unusual case," it nevertheless recognized that "a district court may use an out-of-district hourly rate – or some rate in between the out-of-district rate . . . and the rates charged by local attorneys – in calculating the presumptively reasonable fee if it is clear that a reasonable, paying client would have paid those higher rates." *Id.*

At issue in *Arbor Hill* was the plaintiff's decision to retain New York City counsel to prosecute a voting rights action in Albany. *See id.* (noting that party seeking out-of-district hourly rates must demonstrate that "his or her retention of an out-of-district attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill"). Since Brewington's office is located within the Eastern District, the issue of retaining out-of-district counsel is not presented here; rather, this case concerns the unique circumstances of practicing law in and around New York City.

As other members of this Court have recognized, the border between the Eastern and Southern Districts of New York is uniquely permeable, with the two districts "linked to one another . . . by numerous bridges, tunnels, and highways." *New Leadership Comm. v. Davidson*, 23 F. Supp. 2d 301, 304 (E.D.N.Y. 1998) (quoting *United States v. Hart-Williams*, 967 F. Supp. 73, 79 (E.D.N.Y. 1997)). "Indeed, it is possible to walk from the

United States Courthouse in Brooklyn, across the Brooklyn Bridge, to the United States Courthouse in Manhattan." *Hart-Williams*, 967 F. Supp. at 79. A strict application of the forum rule would ignore this geographic reality and its economic consequences; as Judge Gershon cautioned in *Davidson*, it "should not be read so strictly as to create an unreasonable disincentive for Manhattan-based attorneys to bring . . . suits in Brooklyn." 23 F. Supp. 2d at 305 (approving magistrate judge's consideration of Southern District rates). By the same token, the rule should not create an incentive for lawyers based in the Eastern District not to take cases in their own backyards because higher rates for the same work lie just across the East River. In short, the Court will consider the prevailing rates in both districts.

The County concedes that the hourly rates of Lockett (a law school graduate not admitted to the bar), Roberts and Cash (paralegals), and Preston (a law student) are reasonable. It argues, however, that the hourly rates for partners (Brewington and Fogelgaren), associates admitted to the bar (Calliste, Pelle-Beer, Lanoix and Cartright) and the associate awaiting admission (Makhijani) should be reduced to $250, $150 and $100, respectively.

### a. Brewington

Brewington has over 25 years' experience as a lawyer. In 1987, he started his own firm, specializing in plaintiffs-side civil rights cases; according to docket searches, he has handled roughly 180 such cases in the Eastern District of New York and another 20 in the Southern District. His peers recognize him as an authority in his specialty, as evidenced by his numerous teaching and speaking engagements.

Other members of this Court have recognized Brewington's considerable talents and experience as a civil-rights litigator: He was awarded $300/hour by Magistrate Judge Boyle in 2000, *see Werring v. SUNY Farmingdale*, 98-CV-5248 (Order of Oct. 4, 2000), and by Judge Seybert in 2003, *see Duke v. County of Nassau*, 98-CV-1495 (Order of Apr. 14, 2003); more recently, in March 2008, Magistrate Judge Tomlinson awarded him $325/hour. *See Cruz v. Henry Modell & Co., Inc.*, 05-CV-1450 (Order of Mar. 31, 2008).

Brewington's proposed rate of $400/hour obviously exceeds his prior fee awards. It is also at the top end of the range of recent awards for similar work in the Eastern and Southern Districts. *See Simmons v. New York City Transit Auth.*, 2008 WL 630060, at *3 (E.D.N.Y. Mar. 5, 2008) (collecting cases and concluding that "[i]n the Southern District, awarded rates have ranged from $250 to over $425 for experienced civil rights attorneys."); *Cho v. Koam Medical Servs. P.C.*, 524 F. Supp. 2d 202, 207 (E.D.N.Y. 2007) ("Overall, hourly rates for attorneys approved in recent Eastern District of New York cases have ranged from $200 to $350 for partners[.]"); *Ueno v. Napolitano*, 2007 WL 1395517, at *9-*10 (E.D.N.Y. May 11, 2007) (awarding hourly rates of $450, $400 and $350 to experienced civil rights attorneys while acknowledging that "[r]ecently, courts have found hourly rates for partners in this district ranging from $225.00 to $370.00 to be reasonable.").[11] The Court

---

[11]Citing *Cioffi v. New York Community Bank*, 465 F. Supp. 2d 202 (E.D.N.Y. 2006), the County argues that the small size of Brewington's firm must be taken into account in determining reasonable hourly rates, "primarily due to varying overhead costs." *Id.* at 219 (citing *Chambless v. Masters, Mate & Pilots Pension Plan*, 885 F.2d 1053, 1058-59 (2d Cir. 1989)). Accordingly, the Court has made every attempt to confine its analysis to similarly sized firms. *See Simmons*, 2008 WL 630060, at *3 (citing rates for small firms); *Ueno*, 2007 WL 1395517, at *4 (awarding hourly rates of $450, $400 and $350 to founders of non-profit center).

nevertheless concludes that it is reasonable: The caliber of Brewington's performance against a tenacious adversary was outstanding and resulted in an extremely favorable result for his client. Based on Brewington's experience and ability – which the Court has personally observed in this and other cases – the Court concludes that he could easily command $400/hour from paying clients in the relevant market. *Accord Ueno*, 2007 WL 1395517, at *10 (awarding $400/hour to attorney with roughly 20 years' experience in civil-rights litigation).[12]

### b. Other Attorneys

Folgelgaren has over 25 years of experience as a lawyer and has practiced civil-rights litigation for the last six years as Brewington's law partner. His proposed hourly rate of $300 is consistent with the ranges for partners cited above.

Pelle-Beer has been practicing since 1999, while Lanoix has been practicing since 2000. Considering their level of experience and contributions to the outcome of this case, the Court concludes that their proposed hourly rate of $250 is reasonable. *See Cho*, 524 F. Supp. 2d at 207 (citing range of $200 to $250 for senior associates); *Aiello v. Town of Brookhaven*, 2005 WL 1397202, at *5 (E.D.N.Y. June 13, 2005) (same).

Calliste and Cartright are both fifth-year associates, a level of experience that falls somewhere between a senior associate and a junior associate. Accordingly, the Court reduces their proposed hourly rate to $175. *See Cho*, 524 F. Supp. 2d at 207 (citing range of

---

[12]The County faults Brewington for failing to provide his retainer agreement with Luca and to describe in greater detail the hourly rate he charges paying clients. The Court is satisfied that, even without these items, Brewington has established that his proposed hourly rate is reasonable.

$100 to $150 for junior associates); *Aiello,* 2005 WL 1397202, at *5 (same); *Simmons,* 2008 WL 630060, at *3 ("Junior associates have been awarded hourly rates upwards of $125 [in the Southern District].").

Finally, Makhijani is a first-year associate who is awaiting admission to the bar. In light of this status, the Court reduces her proposed hourly rate to $100.

### 3. *Adjustments*

Based on the Court's findings as to reasonable hours and rates, the presumptively reasonable fee breaks down as follows:

| Staff Member | Hourly Rate | No. of Hours | Proposed Lodestar |
|---|---|---|---|
| Frederick K. Brewington | $400 | 269.30 | $107,720.00 |
| Ira Fogelgaren | $300 | 23.50 | $7,050.00 |
| Gregory Calliste, Jr. | $175 | 3.70 | $647.50 |
| Wendy Pelle-Beer | $250 | 110.60 | $27,650.00 |
| Leslie J. Lanoix | $250 | 83.40 | $20,850.00 |
| Valerie M. Cartright | $175 | 41.20 | $7,210.00 |
| Mili Makhijani | $100 | 49.75 | $4,975.00 |
| Precilla Lockett | $100 | 34.45 | $3,445.00 |
| Victoria Roberts (paralegal) | $75 | 0.50 | $37.50 |
| Conor Cash (paralegal) | $75 | 1.50 | $112.50 |
| Robert Preston (law student) | $25 | 1.00 | $25.00 |
| **TOTAL** | | **618.90** | **$179,722.50** |

A district court may adjust the lodestar/presumptively reasonable fee "based on case-specific considerations," *Arbor Hill,* 522 F.3d at 186; however, there is "[a] strong presumption that the lodestar figure . . . represents a 'reasonable' fee." *Pennsylvania v.*

*Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986). Apart from its challenges to the number of hours and hourly rates, the County does not propose any downward adjustments to the presumptively reasonable fee; Brewington, for his part, does not propose any upward adjustments. Therefore, the Court concludes that the presumptively reasonable fee is, in fact, reasonable.

### IV. Conclusion

The Clerk is directed to enter judgment in favor of Luca and against the County in the amount of $949,973.86, which includes $150,000 in compensatory damages, $604,589 in front pay, $179,722.50 in attorney's fees and $15,662.36 in costs.

**SO ORDERED.**

s/FB

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 13, 2008

# Appendix A: Future Lost Wages

| Year | Police Officer Wages | Corrections Officer Wages | | Difference | Present Value* |
|------|------|------|------|------|------|
| | | Base | Longevity | | |
| 2008 | 75,989 | 75,551 | 275 | 163 | 163 |
| 2009 | 82,951 | 78,573 | 550 | 3,828 | 3,681 |
| 2010 | 90,081 | 81,716 | 825 | 7,540 | 6,971 |
| 2011 | 94,831 | 84,984 | 1,110 | 8,737 | 7,767 |
| 2012 | 114,222 | 88,384 | 1,350 | 24,488 | 20,932 |
| 2013 | 118,791 | 91,919 | 125 | 26,747 | 21,984 |
| 2014 | 123,543 | 95,596 | 125 | 27,822 | 21,988 |
| 2015 | 128,484 | 99,420 | 125 | 28,939 | 21,991 |
| 2016 | 133,624 | 103,397 | 125 | 30,102 | 21,995 |
| 2017 | 138,969 | 107,533 | 125 | 31,311 | 21,999 |
| 2018 | 144,527 | 111,834 | 125 | 32,568 | 22,002 |
| 2019 | 150,308 | 116,307 | 125 | 33,876 | 22,005 |
| 2020 | 156,321 | 120,960 | 125 | 35,236 | 22,008 |
| 2021 | 162,574 | 125,798 | 125 | 36,651 | 22,012 |
| 2022 | 169,076 | 130,830 | 125 | 38,121 | 22,014 |
| 2023 | 175,840 | 136,063 | 125 | 39,652 | 22,017 |
| 2024 | 182,873 | 141,506 | 125 | 41,242 | 22,019 |
| 2025 | 190,188 | 147,166 | 125 | 42,897 | 22,022 |
| 2026 | 197,796 | 153,052 | 125 | 44,619 | 22,025 |
| 2027 | 205,707 | 159,175 | 125 | 46,407 | 22,027 |
| 2028 | 213,936 | 165,542 | 125 | 48,269 | 22,029 |
| 2029 | 222,493 | 172,163 | 125 | 50,205 | 22,032 |
| 2030 | 231,393 | 179,050 | 125 | 52,218 | 22,034 |
| 2031** | 125,137 | 96,830 | 125 | 28,182 | 11,434 |
| **TOTALS** | $3,629,654 | $2,863,349 | $6,485 | $759,820 | **$447,151** |

*The present value of each year's difference is the difference divided by $1.04^n$, where $n$ is the number of years from 2008 (i.e., $n=1$ for 2009, $n=2$ for 2010, and so on).

**January 1st-July 5th.

# Appendix B: Future Lost Pension Benefits

| Year | Police Officer Benefits | | Corrections Officer Benefits | Difference | Present Value[*] |
|---|---|---|---|---|---|
| | P.O. Pension | C.O. Pension | | | |
| 2031[**] | 69,536 | 3,426 | 59,241 | 13,721 | 5,567 |
| 2032 | 141,910 | 6,991 | 120,901 | 28,000 | 10,923 |
| 2033 | 141,910 | 6,991 | 120,901 | 28,000 | 10,503 |
| 2034 | 141,910 | 6,991 | 120,901 | 28,000 | 10,099 |
| 2035 | 141,910 | 6,991 | 120,901 | 28,000 | 9,711 |
| 2036 | 141,910 | 6,991 | 120,901 | 28,000 | 9,338 |
| 2037 | 141,910 | 6,991 | 120,901 | 28,000 | 8,979 |
| 2038 | 141,910 | 6,991 | 120,901 | 28,000 | 8,634 |
| 2039 | 141,910 | 6,991 | 120,901 | 28,000 | 8,302 |
| 2040 | 141,910 | 6,991 | 120,901 | 28,000 | 7,983 |
| 2041 | 141,910 | 6,991 | 120,901 | 28,000 | 7,676 |
| 2042 | 141,910 | 6,991 | 120,901 | 28,000 | 7,381 |
| 2043 | 141,910 | 6,991 | 120,901 | 28,000 | 7,097 |
| 2044 | 141,910 | 6,991 | 120,901 | 28,000 | 6,824 |
| 2045 | 141,910 | 6,991 | 120,901 | 28,000 | 6,562 |
| 2046 | 141,910 | 6,991 | 120,901 | 28,000 | 6,310 |
| 2047 | 141,910 | 6,991 | 120,901 | 28,000 | 6,067 |
| 2048 | 141,910 | 6,991 | 120,901 | 28,000 | 5,834 |
| 2049 | 141,910 | 6,991 | 120,901 | 28,000 | 5,610 |
| 2050 | 141,910 | 6,991 | 120,901 | 28,000 | 5,394 |
| 2051[***] | 72,374 | 3,565 | 61,660 | 14,279 | 2,644 |
| TOTALS | $2,838,200 | $139,820 | $2,418,020 | $560,000 | $157,438 |

[*]The present value of each year's difference is the difference divided by $1.04^n$, where $n$ is the number of years from 2008 (i.e., $n=23$ for 2031, $n=24$ for 2032, and so on).

[**]July 6th-December 31st.

[***]January 1st-July 5th.